RANDY S. GROSSMAN
United States Attorney
CHRISTOPHER ALEXANDER, Cal Bar No. 201352
VALERIE H. CHU, Cal Bar No. 241709
Assistant U.S. Attorneys
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
Tel: (619) 546-6665 / 6750
Email: Christopher.m.alexander@usdoj.gov / valerie.chu@usdoj.gov

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 20CR2887-WQH |
|---|---|
| v. | **UNITED STATES' TRIAL MEMORANDUM** |
| ANTHONY DUANE BELL, SR (1), ANTHONY DUANE BELL, JR (2), Defendants. | Date: June 26, 2023<br>Time: 9:00 a.m. |

The United States of America, by and through its counsel, Randy S. Grossman, United States Attorney, and Christopher Alexander and Valerie H. Chu, Assistant United States Attorneys, hereby files its Trial Memorandum.

# I
# STATEMENT OF THE CASE

### A. Indictment

On September 18, 2020, a federal grand jury returned a 35-count indictment charging Defendant Anthony Duane Bell, Sr. ("Bell SR") and Anthony Duane Bell, Jr. ("Bell JR") in Count 1, with conspiracy, in violation of 18 U.S.C. § 371, in Counts 2-8, with substantive counts of health care fraud, in violation of 18 U.S.C. § 1347, in Counts 9-30, with substantive counts of payment of illegal remuneration (kickbacks), in violation of 42 U.S.C. § 1320a-7b(b)(2)(A), and with criminal forfeiture. Bell JR was also charged, alone, in Counts 31-35 with making false statements to the government, in violation of 18 U.S.C. § 1001.

The indictment alleges that the following three properties are subject to criminal forfeiture as proceeds of the scheme:

   a. $536,422.59 in funds from Acct # 6278570285 held in the name of Universal Medical Solutions LLC at Wells Fargo bank;
   b. $269,952.56 in funds from Acct # 6278570293 held in the name of Universal Medical Solutions LLC at Wells Fargo bank; and
   c. Real property located at 5034 Bluff Place, El Cajon, California 92020 including all appurtenances, improvements, and attachments thereon.

### B. Trial Status

Trial is scheduled for June 26, 2023, at 9:00 a.m., before the Honorable William Q. Hayes. The United States anticipates that its case-in-chief will last seven days.

### C. Defense Counsel

Defendant Bell SR is represented by attorney David Zugman. Defendant Bell JR is represented by attorney Keith Rutman.

### D. Custody Status

Defendants are not in custody.

E. **Interpreter**

The United States does not require an interpreter.

F. **Jury Waiver**

Defendants have not filed a jury waiver.

G. **Motions *In Limine***

On June 7, 2023, the Court made the following rulings on the Parties' motions: (1) took under submission Defendants' motion to severe Bell JR's false statement counts (2) granted submitting the forfeiture count to the jury; (3) denied without prejudice admission of evidence of genetic testing as inextricably intertwined; (4) denied motion to exclude testimony of Quindoza; (5) denied motion to dismiss the indictment due to an alleged violation of the Sixth Amendment Speedy Trial Clause; (6) granted motion for joinder in co-defendant's motions; (7) denied without prejudice motion to admit expert testimony; (8) granted, in part, motion to admit evidence of Bell JR's false statements on PPP Loans under 404(b) is denied and permitting questioning under 608(b) is granted; (9) granted motion to admit certified business and public records; (10) granted motion to admit 1006 summaries; (11) denied without prejudice motion to admit recording; (12) denied until sufficient foundation is laid motion to admit cell phone download; (13) denied motion to preclude inadmissible hearsay; (14) denied motion to preclude irrelevant testimony and argument; (15) granted motion to preclude defense experts; (16) granted motion to exclude witnesses except case agent and defense investigator; (17) granted motion for reciprocal discovery; (18) deferred ruling on attorney conducted *voir dire*; (19) granted motion to exclude indictment from the jury room; (20) denied motion to exclude evidence of financial condition; (21) deferred ruling on motion to hold preliminary jury instructions conference; and (22) granted motion to allow further evidentiary objections.

The Court ordered the United States to file jury instructions by June 19, 2023 and the defense to file by June 23, 2023. The Court ordered the defense to identify challenged post-arrest statements by June 12, 2023. Finally, the Court ordered the United States to

provide any *Jencks* discovery by June 18, 2023.

I. **Stipulations**

The Parties have not entered any stipulations. The Parties have agreed to have two beneficiaries testify by remote video.

J. **Discovery**

The United States will continue to comply with its discovery obligations. To date, the United States has produced approximately 10 TBs of discovery. Defendants have not provided any reciprocal discovery.

## II
## STATEMENT OF FACTS

A. **Offense Conduct**

Anthony Duane Bell, Sr ("Bell SR") and co-conspirators Charless Burruss and Armani Adams (both charged elsewhere) worked together at a company called PA Healthcare, which supplied pharmaceutical products to wholesale purchasers. In 2016, Bell SR suggested to Burruss that that PA Healthcare should expand its business and begin supplying durable medical equipment ("DME"), primarily orthotic braces like knee, shoulder, back, and wrist braces, to patients via mail, and seek reimbursement from insurers, primarily Medicare. Initially, Adams was not involved in the DME side of PA Healthcare.

Bell SR and Burruss worked together to obtain a DME provider license for PA Healthcare, and in 2016, PA Healthcare successfully enrolled to become a DME supplier for Medicare beneficiaries. The enrollment application listed Bell SR as the general manager of the company. Bell SR and Burruss soon admitted Armani Adams to the DME side of PA Healthcare. The conspirators soon expanded again, with each creating his own separate businesses to enroll as DME providers and bill Medicare. Bell SR and his son Anthony Duane Bell, Junior ("Bell JR") opened a DME company called Universal Medical Solutions ("UMS"), applying in June 2017 to enroll as a DME supplier with Medicare.

Burruss and Adams invested money to help launch UMS, shared in its revenue, and remained involved in its operations. Bell SR and Bell JR later opened a second location, referred to as UMS 2.  Similarly, Adams and Burruss launched their own separate DME companies, under various names.  Adams, Burruss, Bell SR, and, to a lesser extent, Bell JR, remained involved in each other's DME companies.  A set of their companies was referred to in a group as the "PA Family", which included PA Healthcare, UMS, and other DME companies.

In order to find customers for their various DME businesses, Burruss, Bell SR, Adams and Bell JR paid between $125 to $350 to indirectly pay a telemedicine doctor to prescribe a brace for a Medicare beneficiary.  They paid for a packet of information that guaranteed a successful payment by Medicare for supplying the brace to a Medicare patient.  The packet of information included: the patient's personal information, medical history, Medicare number, and an audio recording between a call center and the patient, in which the patient supposedly agreed to accept the brace. The packet also included a signed prescription from a doctor, obtained via telemedicine, claiming that the brace was medically necessary for the patient – although in almost all cases the prescription was signed by a physician who had no previous doctor-patient relationship with the patient, was often in another state, and at most had conducted an audio call with the patient. In all cases the doctor had not conducted any kind of physical examination of the patient.

The co-conspirators bought thousands of these patient packets, each time indirectly paying the telemedicine doctors – indeed, the packets were referred to in the industry as "Doctor's Orders" or "D.O.'s.".  The co-conspirators bought D.O.'s from various vendors, including Pantheon, Chronos Strategies, America LLC, REMN, PaddlePoint, US Care Associates, and others.  These vendors, also referred to by the parties as "marketing companies" or "marketers" to conceal their unlawful trafficking in Medicare patients, obtained personal information from Medicare patients via high-pressure call centers, and then paid a portion of the funds from the DME companies to telemedicine doctors to sign the prescriptions for patients they had never examined.

The "marketing companies" guaranteed that the DME company would be paid by Medicare for the claim, and issued replacements or credits if the claim was denied by Medicare, or of the patient returned the brace.

The conspirators purchased D.O.'s for a variety of braces, paying the most (up to $350) for back brace prescription, the type of DME for which Medicare offered the highest reimbursement. The conspirators could then, after shipping the brace to the patient, bill Medicare around $1,359.89 for each back brace, through their various DME companies. The conspirators also bought other braces at lower prices, including wrist, knee, and shoulder braces, and billed Medicare accordingly.

Because paying for patients to bill Medicare violates the Anti-Kickback Statute ("AKS") – and each DME provider was advised of the AKS rules, and promised to comply with the rules, upon enrolling as a Medicare provider – the DME company conspirators and the "marketing" companies concealed their unlawful kickback arrangement through a variety of deceptive practices.  These included sham "marketing" agreements. These agreements read as if a conspirator's DME company would pay for marketing services, or "processing" services, on an hourly basis.  But revealing the true nature of the scam, the "marketing" invoices were actually based on the number and type of braces purchased by the DME company from the "marketing" company, and not the number of hours supposedly worked in the open market to find potential (not guaranteed) customers for the DME company.  In any case, by supplying replacements and credits for claims that had been denied by Medicare, the transactions revealed that the DME companies were paying for guaranteed Medicare patients, not hourly marketing efforts (which would not be subject to being "returned").

Bell SR and Bell JR spent hundreds of thousands of dollars buying patients in the form of D.O.'s from "marketing" companies, including making the payments on the dates, and to the vendors, set forth in Counts 9-30. In exchange, for dates of service between September 7, 2017 and April 8, 2019, UMS submitted $26.26 million in claims to Medicare, and got paid $12.67 million.  UMS 2, for dates of service between February 19,

2018 and April 8, 2019 -- just over a year -- submitted $20.3 million in claims to Medicare, and got paid $9.05 million. In total, Bell SR and Bell JR through UMS 1 and UMS 2 billed over $46.57 million to Medicare, and were paid approximately $21.73 million.

On April 9, 2019, a nationwide take-down of DME companies, marketing companies, and telemedicine operations brought an end to this cash grab.

That day, federal agents executed search warrants at UMS 1 and 2, and at locations associated with Burruss and Adams. Both Bell SR and Bell JR agreed to be interviewed by agents.

### B.     Bell JR's False Statements

The false statement charges against Bell JR stem from his Medicare enrollment application for UMS, and his April 9, 2019 interview with agents. The allegations include:

- In Count 31, that Bell JR lied when he certified, in an enrollment application to Medicare for UMS, that he had listed all persons with ownership, partnership interest, or managing control, though he had deliberated omitted naming his father, Bell SR.
- In Count 32, that Bell JR lied when he told an FBI agent that he had never heard of a company called "PA Healthcare."
- In Count 33, that Bell JR lied when he told an FBI agent that his father Bell SR had never worked at a DME company before working at UMS.
- In Count 34, that Bell JR lied when he told an FBI agent that he and his father had started UMS "from the ground up."
- In Count 35, that Bell JR lied when he told an FBI agent that he, Bell JR, ran the "day to day operations" at UMS.

Indictment, Counts 31-35.

## III
## WITNESSES

The United States anticipates calling some or all of following witnesses in its case-in-chief:

1. Armani Adams (Business Partner)
2. Dorothea Blue Back (Medicare Beneficiary)
3. Charles Burruss (Business Partner)
4. Joseph DeCorso (Medical Doctor)
5. Richard Epstein (REMN Management)
6. Shannon Haas (Medical Doctor)
7. Donald Johnson (Medicare Beneficiary)
8. Herbert Kimble (Chronos / Pantheon)
9. Clara Maxwell (Medicare Beneficiary)
10. Tami Morales (Universal Medical Solutions employee)
11. Drew Mycka (FBI Special Agent)
12. Mary Nossaman (Medicare Beneficiary)
13. Karen Olsen (FBI Special Agent)
14. Ismael Piedra (Medicare Beneficiary)
15. Stephen Quindoza (Medicare Expert)
16. Michael Richards (Medicare Beneficiary - via video)
17. Emanuel Silva (US Care Associates)
18. Ronald Silverman (Medicare Beneficiary)
19. Teresa Suafoa (Universal Medical Solutions Employee)
20. Amy Sutter (HHS-OIG Special Agent - Retired)
21. Randy Swackhammer (Medical Doctor)
22. Jonathan Tanner (America LLC)
23. Ricky Taylor (Medicare Beneficiary - via video)
24. Todd Townsend (FBI Special Agent)
25. Debbie Washington (PA Healthcare)
26. Jonathan Ramos (HHS-OIG Special Agent)

IV

**EXHIBITS**

The United States will file an exhibit list with the Court by the first day of trial. Presently, the United States intends to offer into evidence or use the following categories of documents:

1. D.O.s for Medicare beneficiary witnesses
2. D.O.s signed by doctor witnesses
3. Audio recordings of calls with Medicare beneficiaries
4. Photographs of braces and the braces themselves
5. Bank Records for UMS 1 and UMS 2
6. Medicare Records
7. Defendants' Recorded Statements to a Cooperating Witness
8. Defendants' Interview Statements
9. Text Messages
10. Emails to and from Defendants

V

**LEGAL ISSUES**

A. **Elements – Count 1: 18 U.S.C. § 371 – Conspiring to Commit Health Care Fraud and Pay Unlawful Remuneration**

The defendants are charged in Count one of the indictment with conspiring to commit health care fraud, pay unlawful remuneration, and make false statements, in violation of Section 1347 of Title 18, Section 1320a-7b(b)(2)(A) of Title 42, and Section 1001 of Title 18 of the United States Code. For the defendants to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

1. First, beginning on or about May 23, 2016, and ending on or about April 9, 2019, there was an agreement between two or more persons to commit at least one crime as charged in the indictment;

  2.  Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

  3.  Third, one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

Model Crim. Jury Instr. 9th Cir. 11.1 (Conspiracy Elements).

  A conspiracy is a kind of criminal partnership—an agreement of two or more persons to commit one or more crimes. The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed.

  For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy. It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another. You must find that there was a plan to commit at least one of the crimes alleged in the indictment as an object of the conspiracy with all of you agreeing as to the particular crime which the conspirators agreed to commit.

  One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy. Furthermore, one who willfully joins an existing conspiracy is as responsible for it as the originators. On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator. Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists.

  An overt act does not itself have to be unlawful. A lawful act may be an element of a conspiracy if it was done for the purpose of carrying out the conspiracy. The government is not required to prove that the defendant personally did one of the overt acts.

  A defendant "is liable for the acts of his co-conspirators though he was not aware of the performance of those acts, nor even of the existence of the actors." *United States v.*

*Roselli*, 432 F.2d 879, 894 (9th Cir. 1970) (quoting *Hernandez v. United States*, 300 F.2d 114, 120 (1962)); Model Crim. Jury Instr. 9th Cir. 11.6 (Conspiracy—Liability for Substantive Offense Committed by Co-Conspirator (Pinkerton Charge)).  The government was not required to identify a specific co-conspirator who performed the claim submission. *Id*. at 895.

### B. Elements – Counts 2 - 8:  18 U.S.C. § 1347 – Health Care Fraud

The defendants are charged in Counts two through eight of the indictment with health care fraud, in violation of Section 1347 of Title 18 of the United States Code.  For the defendants to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

1. First, the defendant knowingly and willfully executed a scheme or plan to defraud a health-care benefit program, or to obtain money or property owned by, or under the custody or control of, a health-care benefit program by means of material false or fraudulent pretenses, representations, or promises;
2. Second, the defendant acted with the intent to defraud; that is, the intent to deceive and cheat;
3. Third, Medicare was a health care benefit program; and
4. Fourth, the scheme was executed in connection with the delivery of or payment for health-care benefits, items, or services.

Model Crim. Jury Instr. 9th Cir. 15.42 (Health Care Fraud Elements) (modified); *see also United States v. Awad*, 551 F.3d 930, 939 (9th Cir. 2009).

"Health-care benefit program" means any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.

"With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section."  18 U.S.C. § 1347(b).

A defendant acts willfully if he knew his conduct was wrongful or unlawful. *See* Model Crim. Jury Instr. 9th Cir. 4.6 (Willfully) and 4.8 (Knowingly).

Depending on the facts, a deliberate ignorance instruction may be appropriate. *See, e.g., United States v. Hong*, 938 F.3d 1040 (9th Cir. 2019) (discussing when it might be appropriate to give a deliberate ignorance (or willful blindness) instruction in the context of a charge of health care fraud.).

### C. Elements – Counts 9 - 30: 42 U.S.C. § 1320a-7b(b)(2)(A) – Offering or Paying Kickbacks

The defendants are charged in Counts nine through 30 of the indictment with payment of illegal remuneration, in violation of Section 1320a-7b(b)(2)(A) of Title 42 of the United States Code. For the defendants to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

1. First, the defendant knowingly and willfully offered to pay or paid money directly or indirectly to a person;
2. Second, the money was offered or paid to the person to induce the referral of a patient insured by Medicare for the furnishing of an item or service;
3. Third, the patient's item or service was covered, in whole or in part, by Medicare; and
4. Fourth, Medicare is a federal health care program.

*See Hong*, 938 F.3d at 1049. There is no Ninth Circuit model jury instruction for 42 U.S.C. § 1320a-7b(b)(1)(A). The instruction above is consistent with the model instruction in the Eighth Circuit. *See* Model Crim. Jury Instr. 8th Cir. 6.42.1320 (2018) (modified).

"With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section." 42 U.S.C. § 1320a-7b(h).

### D. Elements – Counts 31 - 35: 18 U.S.C. § 1001 – False Statement

Bell JR is charged in Counts 31 through 35 of the indictment with knowingly and willfully making a false statement in a matter within the jurisdiction of a governmental

agency or department in violation of Section 1001 of Title 18 of the United States Code. For the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

1. First, the defendant made a false statement;
2. Second, the statement was made in a matter within the jurisdiction of the Centers for Medicare Services or the Federal Bureau of Investigation;
3. Third, the defendant acted willfully; that is, the defendant acted deliberately and with knowledge both that the statement was untrue and that his or her conduct was unlawful; and
4. Fourth, the statement was material to the decisions or activities of the Centers for Medicare Services or the Federal Bureau of Investigation; that is, it had a natural tendency to influence, or was capable of influencing, the agency's decisions or activities.

Model Crim. Jury Instr. 9th Cir. 24.10 (False Statement to Government Agency).

To make a false statement "willfully" under Section 1001, the defendant must have both the specific intent to make a false statement and the knowledge that his or her conduct was unlawful.

# VI
# **PROPOSED VOIR DIRE**

The United States requests that the below *voir dire* questions be addressed to the jury panel.

1. Of those of you who have sat on criminal juries, did any of those juries fail to reach a unanimous verdict?
2. The United States will be calling witnesses employed by Health and Human Services and the Federal Bureau of Investigation. Does anyone have family members or close friends who work, or have worked, for these agencies? Would that prevent you from being fair and impartial?

3. Has anyone had an unpleasant experience with any law enforcement personnel, especially Health and Human Services and Federal Bureau of Investigations?

4. Does anyone have any negative views of either agency that would prevent you from being fair and impartial?

5. Does anyone have strong feelings about Medicare that would prevent you from being fair and impartial in this case?

6. Does anyone have strong feelings about the health care system, or health care insurance, that would prevent you from being fair and impartial in this case?

7. Have you, or any family member, had an unpleasant experience with the Medicare program that might prevent you from being fair and impartial in this case?

8. Does anyone believe that individuals providing health care items or services should not be prosecuted for making false statements to Medicare?

9. Does anyone think that defrauding Medicare should not be a crime, because Medicare pays too much or does not check the claims carefully enough?

10. Does anyone believe that any individual seeking health care should receive it at government cost, regardless of whether the individual qualifies for Medicare coverage?

11. Does everyone understand that both sides – the Defendant and the United States – are entitled to a fair trial?

12. Does everyone understand that as a juror your duty is to apply the law regardless of whether you agree with it?

13. Does anyone think that, regardless of the strength of the evidence, they will have trouble deciding whether the Defendant is guilty or not guilty? For example, does anyone have religious or moral beliefs which will make it difficult for them to make a decision strictly based on the law and facts of this case? Or to sit in judgment of another?

# VII
# **JURY INSTRUCTIONS**

The United States has submitted proposed jury instructions under separate cover.

DATED: June 19, 2023.

                                        Respectfully submitted,

                                        RANDY S. GROSSMAN
                                        United States Attorney

                                        */s/ Christopher Alexander*
                                        CHRISTOPHER ALEXANDER
                                        Assistant U.S. Attorney

                                        */s/ Valerie H. Chu*
                                        VALERIE H. CHU
                                        Assistant U.S. Attorney